FOURNET, Chief Justice.
Mrs. Alma Ruth Bishop Farmer, individually and as administratrix of the succession of her late father, David D. Bishop, joined by her mother and brother, instituted this, suit against Mrs. Billie Hall Bonansinga and Mrs. Esther Davis Hall Bishop, to have (1) set' aside as a simulation a sale of property made by Bishop and Mrs. Esther Bishop on November 14, 1949, to Mrs. Bonansinga, or, in the alternative, revoked as a fraudulent transfer; (2) cancelled and erased from the public records the sale and resale of this property by Mrs. Bonansinga to the Home Building and Loan Association in December of 1950;[1] (3) judicially recognized this property belongs to decedent’s estate and decreed that it be inventoried and administered as such, and (4) an accounting of rents and revenues arising from the use and occupancy of the property by defendants. They are appealing from the judgment of the lower court dismissing their suit on the merits.
The property in question, which is located at 1533 Erato Street in New Orleans, Louisiana, was acquired jointly by David D. Bishop and Esther Davis Bishop[2] on December 30, 1936, for $9,000, only $200 of *997 which was paid in cash. It was operated by them as an apartment-rooming house until November 14, 1949, when they jointly sold it to Mrs. Billie Hall Bonansinga, daughter of Mrs. Esther Davis Bishop, for a recited consideration of $11,000, $3,500 of which was stipulated as being paid in cash and the balance represented by a $7,500 note.
The record reflects that Bishop and Mrs. Esther Davis Bishop moved to New Orleans in 1922 and continued to live here until his death in 1952. Up until 1934, when she and the first husband whom she had married in 1932 moved away from the home, Mrs. Bonansinga (who was born in 1909 and was then approximately 25 years of age) lived with her mother and stepfather. She returned to live with them upon her separation from her husband in 1937 and remained there until her second marriage in 1947. Bishop, who was a heavy drinker, was, during this time, rarely employed. It was only in May of 1950 that he secured work in the record room of the Civil District Court for the Parish of Orleans. Mrs. Bishop had difficulty maintaining the family on her earnings as a waitress and some time operator with a friend of a small restaurant. For this reason it became necessary for Mrs. Bonansinga, even during high school days, to work on Saturdays and during the summer months to help out in implementing the family income. From the time of her graduation from high school in 1926, she advanced to her mother and stepfather a good part of the money she earned. At the time of the trial she was still employed by the firm she went to work for in June of 1929, and, during this entire time had, in addition to turning over to the Bishops regular amounts from her earnings, advanced to them additional large sums, including (1) $300 in 1932 to help Bishop and his daughter, the plaintiff Mrs. Alma Ruth Bishop Farmer, open a restaurant so that Bishop might have some employment, a venture that failed within a few months; (2) the $200 down payment made at the time the house on Erato street was purchased in 1936; (3) $500 for the construction of an additional bathroom in 1940-1941; (4) '$700 for repairs to the house in 1947; (5) $600 on one occasion and $360 on another to help them pay the mortgage assumed on the property at the time of its purchase; and (6) $400 for medical expenses during a three year period when her mother was ill.
There is no testimony in the record with respect to the transaction of November 14, 1949, other than that of Mrs. Bonansinga, who was called by the plaintiffs under the *999 act to be a witness on cross-examination. Mrs. Bonansinga readily admitted the cash consideration of $3,500 stipulated in the deed had not, in fact, been paid at the time of its confection, explaining, as she is authorized by law to do,[3] that this consideration was represented by advances she had made to her mother and stepfather over a period of some twenty years, and which far exceeded the $3,500 figure agreed upon by them. She further testified the $7,500 note given in payment of the remainder of the purchase price showed on the reverse side a credit of $2,500 signed by her stepfather on March 8, 1940, and a similar creditor on August 25, 1950, signed by her mother. The August credit, according to her testimony, was in settlement of rents Mrs. Bishop had collected in managing the house for Mrs. Bonansinga following the sale, and the March credit was in consideration of her agreement with her stepfather that her mother and stepfather would be permitted to continue using and occupying, rent free during the remainder of their lives, the apartment in which they were then living, and, in addition, that Mrs. Bonansinga would continue to help them in the future as she had done in the past. She further testified she paid $1,000 to her mother on the $2,500 balance from the $2,000 she borrowed from the Homestead in December of 1950, at which time the $7,500 note was legally cancelled as paid, and the understanding she had with her mother at that time was that Mrs. Bishop was to retain sufficient out of the rents, after meeting the monthly mortgage payments of $23.-45, to liquidate the remaining balance of $1,500.
This testimony of Mrs. Bonansinga. is not only uncontradicted,[4] but impressive. She was able to itemize in some detail the sums given her mother and stepfather over the years, showing, as above analyzed, they far exceeded the $3,500 which forms the basis of the first payment on the property. Counsel for appellants were also obviously impressed with her testimony, for they offered no countervailing evidence. We therefore conclude, as did the trial judge, the sale was not a simulation.
In brief here counsel for appellants concede the sale may not be avoided as a simulation. They argue, nevertheless, that inasmuch as Mrs. Farmer and her brother arc forced heirs of their father, the sale was in fraud of their rights as “creditors” of his . estate and the sale is, therefore, vulnerable to attack under Article 1978 et seq. of the LSA-Civil Code of 1870. They, cite in reli- , *1001 ance Maples v. Mitty, 12 La.Ann. 759; Sullice v. Gradenigo, 15 La.Ann. 582; Perrault v. Perrault, 32 La.Ann. 635; and Jones v. Jones, 119 La. 677, 44 So. 429.
Whatever consolation appellants may derive from isolated passages quoted from these decisions, an analysis discloses they .are not authority for their contention. The Maples, Perrault, and Jones cases were •suits by forced heirs under Articles 1502-1518 of the code to have allegedly excessive donations made by their ancestors reduced in so far as they infringed on their legitime. Article 1504 .in this group specifically provides that such donations may be reduced in court action by forced heirs, or by their heirs or assigns only, and that “neither the donees, legatees, nor creditors of the deceased can require that reduction nor avail themselves of it.” (Emphasis supplied.)
The Sullice case was not instituted by foixed heirs as “creditors” to have revoked a conveyance allegedly executed in fraud of their rights as such. On the contrary, it' was a contest between a curator representing bona- fide creditors of a decedent to have avoided as a simulation a sale purportedly executed in plaintiffs favor in fraud of their rights as creditors. When the transferee urged that these creditors were without right to question the sale inasmuch as the contract had been made prior to the accrual of their debts, Article 1993, the ■ court held such a rule inapplicable in the case of a simulated sale pure and simple,since such a sale, if simulated under the proof, was considered as never having been • made and the property, therefore, to be' that of the debtor; consequently, that the' revocatory action could be instituted to' avoid simulated sales without regard to tha date or origin of the claims of the creditors.
Articles 1968-1994 of the code, to be found in the section dealing with the ef-; feet of obligations and the manner in which they may be avoided by creditors not par- • ties to them, has no reference to forced heirs as “creditors” of successions as con-; templated in the jurisprudence,[5] but to cred- ■ itors as ordinarily understood. The method ' of enforcing the rights there given are very explicit and the prerequisites essential. The suit may be instituted only by a credi *1003 tor whose debts have been liquidated by-judgment of court, unless the defendant in such action is made party to the suit for the liquidation of the debt. Articles 1968 and 1972. The conveyance must have been made in fraud of the rights of other creditors and for the specific purpose of preferring one creditor over others. Article 1978. The debtor must have been insolvent at the time of the, transfer and the conveyance must have resulted in injury to the complaining creditor. Articles 1971 and 1984. Consequently, even if counsel are correct in their contention that plaintiffs, being forced heirs, are entitled as creditors of Bishop’s succession to institute the revocatory action to annul this sale under Articles 1968-1994 of the code, it is obvious they could not prevail since there is no allegation that Bishop was, at the time of the transfer, insolvent, and there is not a scintilla of proof in the record in this respect. It is, therefore, unnecessary for us to discuss and analyze the evidence in so far as it may seem to support the contention of appellants that it discloses there exists a presumption of fraud.[6] Nor is it necessary for us to consider the argument that this was not, in fact, a sale, but a dation en paiement, and as such invalid under Article 2658 of the code, for this article provides that when the debtor is insolvent, he may not “give in payment to one creditor, to the prejudice of the others, any other thing than the sum of money due.”
For the reasons assigned the judgment appealed from is affirmed at the cost of the appellants.

. This association was joined as a party defendant but made no appearance.

. Appellants have sought throughout to establish, largely by innuendo, that Bishop never divorced bis first wife, and, consequently, was not married to Mrs. Esther Davis Bishop, who asserts such a marriage ceremony took place in Vicks *997 burg, Mississippi, on February 12, 1921, and that she lived with Bishop from that time until his death in 1952 without knowledge of any legal impediment thereto, if such in fact existed. However, this is not an issue in the case and is not material to a decision of those raised inasmuch as the property was purchased by these parties jointly, and counsel for appellants concede in this court, as they must, that whatever rights the appellants have are, of necessity, limited to the decedent’s half interest in the property.

. Article 1900 of the LSA-Civil Code of 1870; Citizens Bank & Trust Co. v. Willis, 183 La. 127, 162 So. 822.

. Two co-employees of Bishop testified they had paid for him, out of money he; gave them (on one occasion out .of money derived' from his pay check that had ' been cashed) mortgage payments made subsequent to the time of the sale, but in view of the understanding Mrs. Bonansinga had with her mother and stepfather about these payments being made out of the rents collected, this testimony does not serve to prove the contentions of appellants.

. The statement in Maples v. Mitty, 12 La.Ann. 759, to the effect that iñ so far ‘ as their legitime is concerned, children are creditors and not heirs of their father’s succession, is traceable to Rachal v. Rachal, 4 La.Ann. 500. In the Rachal case forced heirs attacked a' sale as a' disguised donation and under a peremptory exception witnesses testified they believed the vendor’s object in selling the property was to put it beyond the'reach of a pending suit, which was contrary to public policy. It was urged in defense that since the contract had for its object a fraudulent purpose the heirs could no more recover under it than could their father. The court, holding the proof warranted the conclusion the sale was avoidable as simulated, stated the alleged object -of the vendor in making the sale could not affect the rights of his forced-heirs since their rights as such were not • derivéd from him but from the law and,' so far as their legitime “is concerned,1 they are not heirs;-' they- are- creditors.”"'5

. It is argued that there are in the record facts that are usually regarded as presumptive evidence of fraud, i. e., (1) the sale was ominium bonorum; (2) the closeness of the family relationship; (3) retention and continued occupancy of the property by the vendors; (4) monthly payments on the mortgage by the vendors after the sale; (5) a vile price; and (6) the listing of the property as their own by the vendors after the sale.